IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

ANNETTE HANLIN-COONEY,

    Plaintiff,

       v.                    CIVIL NO.: WDQ-13-1731

FREDERICK COUNTY, MARYLAND,
    et al.,

    Defendants.

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

MEMORANDUM OPINION

Annette Hanlin-Cooney[1] sued Frederick County (the "County")
and others[2] for constitutional violations under 42 U.S.C. § 1983
and state law claims. ECF No. 1. Various defendants have filed
a motion to dismiss for failure to state a claim or to bifurcate
claims for discovery and trial and two motions to dismiss or for

---

[1] Hanlin-Cooney sued individually and as personal representative
of the Estate of William John Hanlin, her deceased son. ECF No.
1 ¶ 1.

[2] Hanlin-Cooney also sued Frederick County Sheriff Charles
Jenkins, in his individual and official capacities; and (2)
David M. DeGrange, Jr. and Robert Swailes, correctional
officers, and Warden William V. DeLauter, in their individual
capacities (collectively, the "prison defendants"). ECF No. 1
¶¶ 23, 24-27. Hanlin-Cooney also sued: (1) Conmed Healthcare
Management, Inc. ("Conmed") and its subsidiary Correctional
Mental Health Services, LLC ("CMHS"); and (2) Janetta Moore and
Jessica Kissane, Conmed and CMHS employees (collectively, the
"medical defendants"). Id. ¶¶ 28-31. Finally, Hanlin-Cooney
sued John and Jane Does 1-25 (the "Does"), "employees, agents
and/or servants of" the named Defendants. Id. ¶ 32.

summary judgment. ECF Nos. 7, 12, 14. No hearing is necessary. Local Rule 105.6 (D. Md. 2011). For the following reasons, the defendants' motions will be granted in part and denied in part.

I. Background[3]

Hanlin-Cooney's son, Hanlin, was born on July 15, 1988. ECF No. 1 ¶¶ 58, 61. "[D]uring the last years of his life," Hanlin abused prescription drugs--oxycodone and Alprazolam--and eventually became addicted. *Id.* ¶¶ 58-59. In March 2010, when Hanlin was hospitalized for injuries sustained during a fight, he was diagnosed with polysubstance abuse. *Id.* ¶ 60.

From May 2 to May 6, 2010, Hanlin was detained[4] at the Frederick County Adult Detention Center in Frederick County, Maryland (the "Detention Center").[5] *Id.* ¶ 49. The reports of

---

[3] For the motion to dismiss for failure to state a claim, the well-pled allegations in the complaint are accepted as true. *See Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011). In reviewing the motion to dismiss, the Court may consider allegations in the complaint, matters of public record, and documents attached to the motion to dismiss that are integral to the complaint and authentic. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[4] The complaint does not explain why he was detained.

[5] Frederick County is a local government entity of the State of Maryland and allegedly hired Jenkins, DeLauter, DeGrange, Swailes, and the Does "to operate or to assist in operating the Detention Center and/or the Medical Unit within the Detention Center." ECF No. 1 ¶ 23. Jenkins is allegedly the "chief law enforcement officer of Frederick County, Maryland and the executive responsible for the operation of" the Detention Center and creation of its "official policy, practices, customs and regulations." *Id.* ¶ 24. DeLauter is the Detention Center's

2

his initial medical screening stated that he had no history of drug or alcohol abuse, and he required no mental health referral. *Id.* However, Detention Center notes from May 4, 2010 indicate that Hanlin was vomiting, a symptom of drug addiction withdrawal, and he was provided with "a list of mental health and substance abuse resources" upon his release. *Id.*

On July 2, 2010, after Hanlin-Cooney called for emergency assistance for Hanlin, a Sheriff's Deputy "determined that John Hanlin was suffering from a mental disorder that rendered him a present danger to his own life or safety or that of others." *Id.* ¶ 65. Hanlin-Cooney also told the Deputy that Hanlin had been abusing drugs and was "extremely depressed." *Id.* The Deputy took Hanlin to the hospital for an emergency evaluation, during which his blood and urine tested positive for "Cannabinoid, Benzodiazepine (*i.e.*, Xanax) and opiates." *Id.* ¶ 67. While at the hospital, Hanlin also threatened to kill himself.[6] *Id.* ¶ 68.

---

Warden and allegedly "develop[ed], maintain[ed] and enforc[ed] knowingly deficient policies, practices, and customs" for the Detention Center's medical care of inmates. *Id.* ¶ 25. Swailes and DeGrange are correctional officers who worked for the Detention Center when Hanlin died. *Id.* ¶¶ 26-27.

[6] Mental and medical health professionals, and the Detention Center's staff, allegedly knew that withdrawal from Oxycontin and Xanax addiction increases the risk of suicide. ECF No. 1 ¶ 66. After Hanlin was incarcerated, the Detention Center did not seek "to obtain any information about Mr. Hanlin's recent

3

On July 7, 2010, a State Trooper stopped the car which Hanlin was driving erratically and saw Hanlin ingest Percocet. *Id.* ¶ 70. The Trooper arrested Hanlin "for drug possession and use of a false prescription." *Id.* Hanlin was taken to the Detention Center. *Id.* ¶ 2. At the Detention Center, the booking officer "wrote into the alerts section that Mr. Hanlin was a drug user, was familiar with CDS (controlled dangerous substances), [and] was a 'mental subject.'" *Id.* ¶ 72. The officer classified Hanlin "as a medium security risk." *Id.* Hanlin was then medically screened, and "it was . . . noted that [he] appeared to be under the influence of a narcotic." *Id.* ¶ 73.

On July 7, 2010, another officer completed a medical screening report of Hanlin, which stated that Hanlin "did not appear to be under the influence of drugs or alcohol, said he did not use drugs, and did not have, or show, signs of weight loss."[7] *Id.* ¶ 74. The report also stated, however, that Hanlin "'appears to be under the influence of something.'" *Id.*

---

drug abuse and suicide threats from any independent health care provider or from any family member." *Id.* ¶ 79.

[7] This report was inconsistent with Detention Center records from Hanlin's previous detentions. Although he was marked as not showing signs of weight loss, "when Mr. Hanlin was in the Detention Center at the beginning of May, 2010, his weight was recorded as having been 25 pounds heavier." ECF No. 1 ¶ 74. Also, the officer stated on the July 2010 form that Hanlin "had never been a patient in a medical hospital," even though

The Detention Center contracted with Conmed and CMHS to provide healthcare services, including mental health services, to the prison. *Id.* ¶¶ 28-29. Two of Conmed's and CMHS's employees, Moore, a nurse, and Kissane, worked at the Detention Center. *Id.* ¶¶ 30-31, 75. Moore reviewed and approved the officer's medical screening report of Hanlin. *Id.* ¶ 75. Some time after, Moore completed two additional medical screening forms which identified Hanlin as a drug abuser with "a history of treatment for substance abuse" and stated that Hanlin appeared to be under the influence of narcotics and was slurring his words. *Id.* ¶¶ 75, 77. One of the forms she completed "cautions to 'notify [a] medical provider'" when an inmate "'appears to be withdrawing from drugs or alcohol.'" *Id.* ¶ 77. Moore approved Hanlin's placement into the general inmate population and did not notify a medical provider of Hanlin's symptoms. *See id.* ¶¶ 76, 78.

On July 8, 2010, Kissane reviewed Moore's assessment of Hanlin and concluded "that no further evaluation was necessary and no mental health referral was required." *Id.* ¶ 80. However, that same day, "Hanlin was heard by staff and inmates . . . crying hysterically that his child had just died . . . and he needed help getting bail money." *Id.* ¶ 81. Kissane

---

Detention Center records from a 2007 detention indicated that Hanlin had been hospitalized previously. *Id.* ¶ 50.

reevaluated Hanlin and concluded that he was a suicide risk and that he was under the influence of drugs and experiencing symptoms of drug addiction withdrawal. *Id.* ¶¶ 82-83. Hanlin was placed in the Medical Unit on "0523 checks," which are "thirty-minute interval checks conducted on inmates who are believed to be at risk of self-harm, including substance abusers."[8] *Id.* ¶¶ 83, 86.

At the Detention Center, after a series of thefts of prescription pharmaceuticals normally used to treat drug withdrawal, Jenkins "instituted a policy or allowed such a policy to be instituted," under which imprisoned persons suffering from withdrawal symptoms were treated with over-the-counter medications only. *See id.* ¶ 5. These medications were less effective, but also less costly to obtain and monitor, than the prescription drugs. *Id.* This policy, which was enforced by DeLauter, allegedly contributed, in part, to the Detention Center's "failure of care" of Hanlin, because Hanlin was not

---

[8] The Detention Center's policy on suicide prevention "apparently permitted only periodic surveillance of at-risk inmates and detainees, generally three times per hour, and frequently far less than that." ECF No. 1 ¶ 10. However, the Detention Center knew from "recent past experience and widespread public information," that its policy was ineffective even when followed, "especially on those housed in its dangerously designed and inadequately maintained Medical Unit." *Id.* Correctional officers also allegedly received insufficient training on suicide prevention--the only training provided was "a short video presentation given as part of their initial orientation system." *Id.* ¶ 107.

6

given any prescription-strength drugs to manage his withdrawal symptoms. *Id.* ¶¶ 5, 55, 85.

"Through" Jenkins, "the Detention Center also made a deliberate decision" not to take detainees and inmates needing medical care to the hospital, allegedly because these costs would be borne by the Detention Center. *Id.* ¶ 56. Jenkins also told the Detention Center to avoid requiring his Deputy Sheriffs to take arrestees to the hospital, because the Deputies would need to wait at the hospital while the arrestees obtained treatment. *Id.* Instead, arrestees, inmates, and detainees would all be treated at the Detention Center.[9] *Id.*

The Detention Center's Medical Unit is "part of a wing that at all relevant times typically housed in excess of 130 inmates and detainees monitored by two, sometimes only by one," correctional officers. *Id.* ¶ 33. The inmates in the Medical Unit "were frequently and deliberately kept in cold, barren cells under conditions amounting to solitary confinement[,] . . . served lower quality food," and had few recreational opportunities."[10] *Id.* ¶ 43.

---

[9] Because Conmed provided all healthcare services to the Detention Center "for a previously negotiated flat fee," this arrangement allegedly incentivized Conmed "to provide less care." ECF No. 1 ¶ 56.

[10] Inmates familiar with the Detention Center, such as Hanlin, knew not to respond accurately to medical screener's questions to avoid being housed in the Medical Unit. ECF No. 1 ¶ 42.

The cell in which Hanlin was housed in the Medical Unit was "unmonitored, solitary . . . not readily observable, not even within earshot of guards," and not "suicide-proof." *See id.* ¶¶ 4, 41. The cell had "metal bunk bed frames that could be used," and had been used previously, "to support makeshift hanging nooses, and bed sheets or other materials from which such nooses easily could be fashioned." *Id.* ¶ 4.

On July 9, 2010, Hanlin-Cooney called the Detention Center at least twice to inform it "that Mr. Hanlin was an active substance abuser who had recently threatened to take his own life." *Id.* ¶ 89. "[H]er information was not provided to the correctional officers," Swailes and DeGrange, assigned that day to monitor Hanlin and perform 0523 checks on inmates. *Id.* ¶¶ 89-90. Swailes and DeGrange logged medical checks on Hanlin every 30 minutes from 8:29 am until 11:21 am, but these records were "deliberately falsified," as Hanlin was not checked on until 11:34 am. *Id.* ¶¶ 91-93. According to Swailes and DeGrange, it was part of the "policies, customs, and/or practices of the Detention Center . . . to [inaccurately] log uncompleted checks . . . to avoid criticism from surveyors/auditors, during facility certification reviews." *Id.* ¶ 94. This "routine[] . . . cut[ting of] corners by" correctional officers assigned to perform "scheduled inmate

checks" also resulted from policies that led to under-staffing of the Detention Center.[11]  *Id.* ¶ 44.

On the morning of July 9, 2010, Hanlin "asked for assistance, expressing his fear that something bad was about to happen to him." *Id.* ¶ 15. He also said he intended to hang himself. *Id.* ¶ 96. Another inmate informed "the correctional officers assigned to monitor" Hanlin about those statements, but the officers "ignored" the warnings and told the inmate "that Mr. Hanlin had been crying out and making" suicide threats all morning. *Id.*

Later that morning, Hanlin committed suicide by hanging himself from a bed sheet tied to the frame of his bunk bed. *Id.* ¶ 16. His body was discovered at about 11:55 am by a food server. *See id.* ¶¶ 16, 101. His suicide was allegedly the "direct and proximate result of the Defendants['] deliberate indifference to the imminent medical needs of Mr. Hanlin and similarly-situated inmates and detainees" and their "purposeful[ choice] not to provide Mr. Hanlin with the . . . level of care

---

[11] The complaint describes these policies in detail, including, *inter alia*, an influx of Immigrations and Customs Enforcement ("ICE") detainees beginning in 2007, increasing need for correctional officers to perform "ministerial tasks" such as collecting linens from inmates, and the need for staff to accomplish increasingly more tasks each workday without a corresponding increase in compensation. ECF No. 1 ¶¶ 38-39. These policies were allegedly put in place by Jenkins and enforced by DeLauter. *See id.*

necessary to avoid the foreseeable consequence of his unaddressed mental health issues and drug abuse withdrawal concerns." *Id.* ¶¶ 3, 16.

After Hanlin's suicide, the Detention Center investigated the circumstances of his death. *Id.* ¶ 12. The investigation concluded that Detention Center officials had failed to follow the Detention Center's suicide prevention policy of checking on at-risk inmates twice per hour and accurately logging those checks,[12] and that Swailes and DeGrange had made false statements and acted incompetently in failing to properly monitor Hanlin. *Id.* ¶¶ 12, 97. However, the Detention Center's Health Care Administrator, Linda Tritsch, who had been the first medical professional on the scene when Hanlin died, believed that Hanlin's death occurred ten minutes before CPR was initiated on

---

[12] The Detention Center is accredited by the Maryland Commission on Correctional Standards ("MCCS"). ECF No. 1 ¶ 40. To be accredited, MCCS requires facilities to have a "'written policy and procedure governing the identification, housing, treatment, supervision, and referral of mentally ill and retarded inmates.'" *Id.* In its "'Compliance Explanation,'" MCCS states that such inmates "are to be housed in specially designated areas . . . with close and constant staff supervision." *Id.* However, the Detention Center did not "perform continuous monitoring of at-risk inmates," and did not have a "realistic plan, consistent with its staffing schedules, to do so." *Id.* ¶ 41. Further, the Detention Center was allegedly aware that its suicide prevention policy was deficient as another inmate-- who was obviously a suicide risk and was under the influence of narcotics--had committed suicide in a similar manner in an unmonitored cell about one year before Hanlin's death. *See id.* ¶ 108.

him.[13]  *Id.*  ¶¶ 12, 101, 106.  Thus, the investigation found that, even if the policy had been followed, Hanlin still would have been able to commit suicide between the periodic checks.  *Id.* ¶¶ 12, 98.  The Detention Center did not revise its suicide prevention policy after Hanlin's death,[14] but it later fired DeGrange.[15]  *Id.* ¶¶ 13, 43.

On August 9, 2010, Hanlin-Cooney was appointed the personal representative of Hanlin's estate.  *See* ECF No. 1-1 at 3.  On September 13, 2010, C. Christopher Brown, Esquire, sent a letter to the Detention Center on Hanlin-Cooney's behalf, "to notify [it] of a potential claim and to request that [it] take prompt steps to preserve any documents or tangible evidence relating to . . . Hanlin's arrest, detention and death, and any investigations into Mr. Hanlin's death."  ECF No. 1-2 at 2.  On April 6, 2011, Peter C. Grenier, Esquire, on Hanlin-Cooney's behalf, sent a letter to the Board of County Commissioners for

---

[13] However, Tritsch also observed blood pooling at Hanlin's feet and ears, which typically occurs 30 minutes to two hours after death.  ECF No. 1 ¶¶ 12, 106.

[14] In 2009-2010, inmates and detainees at the Detention Center attempted suicide 136 times; three attempts--including Hanlin's--were successful. ECF No. 1 ¶ 14.  When a reporter asked Jenkins about the suicides at the Detention Center, Jenkins said: "'At this point, I am not sure the public has a whole lot of sympathy for these individuals.'"  *Id.*

[15] DeGrange was allegedly fired "after he raised concerns about the suicide of another detainee" who was placed in a Medical Unit cell.  *Id.* ¶ 98.

Frederick County to notify it of "potential claims" arising out of the death of Hanlin at the Detention Center. *Id.* at 3. The letter demanded that the County "take all necessary steps to preserve potentially discoverable material" related to Hanlin's death.[16] *Id.* at 4.

On June 14, 2013, Hanlin-Cooney filed a nine-count complaint against the defendants. ECF No. 1. Counts One, Two, and Three assert that the prison defendants, in their individual capacities ("individual capacity defendants"), the medical defendants, and the Does[17] deprived Hanlin of his 14th Amendment rights to "personal security, physical integrity, and privacy," in violation of § 1983. ECF No. 1 at 37-44. Count Four asserts that Jenkins, in his official capacity, and the County have *Monell* liability under § 1983 for violations of Hanlin's Fifth, Eighth, and Fourteenth Amendment rights. *Id.* at 45-48. Count Five asserts that DeGrange, DeLauter, Swailes, the medical defendants, and the Does violated Hanlin's rights under Article

---

[16] These letters allegedly gave the County "notice of [Hanlin-Cooney's] claim pursuant to Md. Code Ann., Cts. & Judicial Proc. § 5-304 (2010 Supp.)." ECF No. 1 ¶ 23.

[17] The Does include "guards, correctional officers, deputy sheriffs or other law enforcement officials, supervisors, managers, jail commanders, medical directors, health service administrators, doctors, nurses, pharmacists, and other health care professionals" who participated in events contributing to Hanlin's death and Hanlin-Cooney's injuries. *See* ECF No. 1 ¶ 32. Hanlin-Cooney notes that she will move for leave to amend the complaint when she has identified the Does. *Id.*

12

24 of the Maryland Declaration of Rights ("Article 24"). *Id.* at 49-51. The remaining counts assert: (1) negligence *per se* against the medical defendants, DeGrange, DeLauter, Swailes, the Does, and the County (Count Six); (2) gross negligence against the individual capacity defendants, the Does, and the County (Count Seven); (3) negligent training and supervision against DeLauter, Conmed, CMHS, the Does, and the County (Count Eight); and (4) negligence against DeGrange, DeLauter, Swailes, the Does, and the County (Count Nine). *Id.* at 51-58. The complaint seeks compensatory damages, punitive damages, interest, and attorneys' fees and costs and demands a jury trial. *See, e.g., id.* at 40, 58.

On July 15, 2013 and August 5, 2013,[18] the medical defendants moved to dismiss for failure to state a claim or for summary judgment. ECF Nos. 7, 14. On July 29, 2013, the prison defendants and the County moved to dismiss or to bifurcate Counts Four and Five against the County and Count Four against Jenkins, in his official capacity. ECF No. 12. On August 22, 2013, Hanlin-Cooney opposed the medical defendants' motions. ECF No. 19. On September 20, 2013, the prison defendants filed a supplement to their motion to dismiss. ECF No. 22. On September 30, 2013, Hanlin-Cooney opposed the motion to dismiss.

---

[18] Kissane moved separately, but her motion fully incorporates the motion and memorandum filed earlier by Conmed, CMHS, and Moore. ECF No. 14.

13

ECF No. 23. On October 7, 2013, Hanlin-Cooney opposed the supplement. ECF No. 24. On October 18, 2013, the prison defendants and the County replied to Hanlin-Cooney's opposition to their motion to dismiss. ECF No. 25.

II. Analysis

   A. Legal Standard for Motion to Dismiss

   Under Federal Rule of Civil Procedure 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

   The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001). Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[] facts that are 'merely consistent with a defendant's liability;'" the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id.* at 679 (internal quotation marks omitted). "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief." *Id.* (internal quotation marks and alteration omitted).

B. Notice

The prison defendants and the County contend that Hanlin-Cooney "did not comply with the notice provision of the [Local Government Tort Claims Act][19] in providing 'notice' to the County." ECF No. 12-1 at 37. Accordingly, they argue, Counts Five through Nine should be dismissed as to the County and its employees. *See id.* Hanlin-Cooney contends that the September 13, 2010 letter from Brown substantially complied with the statutory notice requirements. *See* ECF No. 23 at 24. She also argues that, even if the Court concluded that the letter did not

---

[19] Md. Code Ann., Cts. & Jud. Proc. § 5-301 *et seq.* (West 2013).

substantially comply, the defendants have not shown "that they have been prejudiced by the lack of notice." *Id.*

The Local Government Tort Claims Act ("LGTCA") requires a plaintiff seeking unliquidated damages from a local government or its employees to submit administrative notice of this claim within 180 days after the injury. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-304(a) (West 2009). In the case of county governments, notice must be "given in person or by certified mail, return receipt requested . . . to the county commissioners or county council of the defendant local government." *Id.* § 5-304(c). The notice is a condition precedent to the right to maintain an action for damages, *Grubbs v. Prince George's County*, 267 Md. 318, 297 A.2d 754 (1972) (*citing Cotham v. Board of County Comm'rs*, 260 Md. 556, 273 A.2d 115 (1971)), and compliance with the notice provision should be alleged in the complaint as a substantive element of the cause of action,[20] *Luy v. Baltimore Police Department*, 326 F. Supp. 2d 682, 693 (D. Md. 2004) (*citing Hargrove v. Mayor & City Council of Baltimore*, 146 Md. App. 457, 463, 807 A.2d 149, 152 (2002)). These notice requirements apply to all torts, including constitutional torts. *See Ransom v. Leopold*, 183 Md. App. 570, 579, 962 A.2d 1025, 1030-31 (2008).

_____

[20] Hanlin-Cooney alleged compliance in the complaint. *See* ECF No. 1 ¶ 23.

16

Notice that fails to strictly comply with the statutory requirements may be sufficient if it is in "substantial compliance." *Carter v. Jess*, 179 F. Supp. 2d 534, 541 (D. Md. 2001) (*citing Loewinger v. Prince George's County*, 266 Md. 316, 317-18, 292 A.2d 67 (1972) *overruled on other grounds by Moore v. Norouzi*, 371 Md. 154, 178, 807 A.2d 632, 646 (2002)). Substantial compliance requires notice "sufficient to fulfill the purpose of the requirement--'to ensure that the local government is made aware of its possible liability at a time when it is able to conduct its own investigation.'" *Faulk v. Ewing*, 371 Md. 284, 308, 808 A.2d 1262, 1278 (2002). The notice must also allow the municipal body "to ascertain the character and extent of the injury and its responsibility in connection with it." *Jackson v. Bd. of Cnty. Comm'rs of Anne Arundel Cnty.*, 195 A.2d 693, 695 (Md. 1963).

Here, Hanlin-Cooney sent two letters to attempt to comply with the notice requirements of the LGTCA. The first letter, although sent within 180 days of Hanlin's death, was mailed to the Detention Center, not to the county commissioners or council, as required by the LGTCA. ECF No. 1-2 at 2; § 5-304(c). Although Maryland courts have found substantial compliance when notice was sent to entities responsible for claims administration or insurance for the municipality, rather

17

than the recipients designated in the LGTCA,[21] there is no indication the Detention Center serves those functions for the County. *See Ransom*, 183 Md. App. at 579-84, 962 A.2d at 1030-33 (finding no substantial compliance when wrong county notified, because "the relationship between the . . . entity [] notified and the person or entity that the statute requires be notified was [not] so close, with respect to the handling of tort claims, that notice to one effectively constituted notice to the other"); *Hansen v. City of Laurel*, 193 Md. App. 80, 95-96, 996 A.2d 882, 891-92 (2010) *aff'd,* 420 Md. 670, 25 A.3d 122 (2011) ("Because the internal affairs departments [of the involved police departments] were not responsible for investigating tort claims, notice to them did not substantially comply with the statutory notice requirement."). Accordingly, because notice was not received by a proper party within the 180 day notice period, Hanlin-Cooney was not in substantial compliance with the LGTCA's notice requirement.

---

[21] *See Moore*, 371 Md. at 177, 807 A.2d at 646 (holding that notice to County's claims administrator sufficed for substantial compliance, because "given [the] comprehensiveness and the degree of control that the County maintains" through their "contractual arrangement[,] . . . actual notice to the County results when notice is given to Trigon"); *Faulk*, 371 Md. at 308, 808 A.2d at 1278 (finding that, on the facts of the case, notice to a town's insurer of claim was substantial compliance).

18

Even if the notice had been sent to a proper party, however, it would have been insufficient. The letter states that Hanlin-Cooney has a "potential claim . . . relating to Mr. Hanlin's death," ECF No. 1-2 at 2, but did not describe the claim or give any details about its factual basis. This information provides insufficient guidance to the County in conducting an investigation into its potential liability for Hanlin's death. *See, e.g.*, *Lanford v. Prince George's Cnty., Md.*, 199 F. Supp. 2d 297, 303-04 (D. Md. 2002) (notice insufficient as to claims against County employees, in part, because it did not state what role County employees played in the events leading to the plaintiff's suit); *Fether v. Frederick Cnty., Md.*, CIV. CCB 12-1674, 2013 WL 1314190, at *8 (D. Md. Mar. 29, 2013) (finding notice insufficient because it did not inform the defendants that the plaintiff intended to assert "survival or Article 24 claims"). Accordingly, because Hanlin-Cooney's notice failed to fulfill the "purpose" of the notice requirement, there was no substantial compliance. *See Faulk*, 371 Md. at 808, A.2d at 1278; *Jackson*, 195 A.2d at 695.

However, even when notice is not in substantial compliance, the notice requirement may be waived "upon motion and for good cause shown . . . unless the defendant can affirmatively show that its defense has been prejudiced by lack of required notice." § 5-304(d); *Martino v. Bell*, 40 F. Supp. 2d 719, 722

(D. Md. 1999). Here, Hanlin-Cooney argues that the defendants have not been prejudiced, but she has not argued or shown that she had "good cause" for her failure to give sufficient notice and has not filed a motion for waiver. *See* ECF No. 23 at 24-25. Accordingly, Hanlin-Cooney has failed to establish that she is entitled to waiver of the notice requirement, even if the defendants have not shown prejudice. *See Curtis v. Pracht*, 202 F. Supp. 2d 406, 414 (D. Md. 2002) ("The Defendants' burden to show prejudice does not arise until a plaintiff establishes 'good cause' to justify the failure to comply with the notice requirement.").

Finally, Hanlin-Cooney's second letter-notice, although received by a proper party, was sent 271 days after Hanlin's death, well outside the 180 day statutory period. ECF No. 1-2 at 3. Hanlin-Cooney has not argued or shown that she had good cause for the delay in sending the letter. *See, e.g.*, ECF No. 23 at 24 n.10. Thus, this letter also did not provide the required notice to the County of Hanlin-Cooney's claims. *See Heron v. Strader*, 361 Md. 258, 265, 761 A.2d 56, 59 (2000) (affirming dismissal of claims when notice sent 249 days after claim arose); *Downey v. Collins*, 866 F. Supp. 887, 890 (D. Md. 1994) (dismissing claims when notice was 45 days late and plaintiff did not establish good cause for the delay). Counts

Five through Nine will be dismissed as to the County and the prison defendants.[22]

C. Arbitration Requirement

In Counts Six and Seven, Hanlin-Cooney asserts claims for negligence *per se* and gross negligence against the medical defendants.[23] *See* ECF Nos. 1 at 51-55, 19 at 8. In Count Eight, Hanlin-Cooney brings a wrongful death and survival claim against Conmed and CMHS, asserting that they are liable for negligent training and supervision. ECF No. 1 at 55-56. The medical defendants contend that, because these claims are for "medical injury," they must first be exhausted through arbitration under Maryland law. *See* ECF No. 7-1 at 8. In response, Hanlin-Cooney "stipulates" to the medical defendants' argument and states that she "does not object" to dismissal of Counts Six and Seven. ECF No. 19 at 8. Accordingly, Counts Six and Seven will be dismissed as to the medical defendants.

---

[22] Because Hanlin-Cooney failed to provide sufficient notice of her claims, the Court need not consider the County's and the prison defendants' arguments that Hanlin-Cooney failed to state a claim in Counts Five through Nine and that they are entitled to immunity from these claims. *See* ECF No. 12-1 at 30-37.

[23] Although Hanlin-Cooney's complaint does not include the medical defendants in the list of defendants against whom she brings Count Seven, the plaintiff's opposition and the medical defendants' motion to dismiss state that Count Seven is asserted against the medical defendants. *See* ECF Nos. 1 at 37, 7-1 at 7, 19 at 8. The Court will adopt the parties' apparent agreement about Count Seven.

Hanlin-Cooney does not, however, discuss Count Eight or expressly consent to its dismissal as to Conmed and CMHS. *See* ECF No. 19 at 8. Under the Maryland Health Care Malpractice Claims Act ("HCMCA"), a claim of medical negligence or malpractice may proceed only after review before the Maryland Health Claims Arbitration Board. *See* Md. Code, Cts. & Jud. Proc., § 3-2A-01 *et seq.* (West 2005); *see also Carroll v. Konits,* 400 Md. 167, 172, 929 A.2d 19, 22 (2007): *Davison v. Sinai Hospital of Baltimore, Inc.,* 462 F. Supp. 778, 779-81 (D. Md. 1978); *Group Health Association, Inc. v. Blumenthal,* 295 Md. 104, 114, 453 A.2d 1198 (1983). "[The] Act covers only those claims for damages arising from the rendering or failure to render health care where there has been a breach by the defendant, in his professional capacity, of his duty to exercise his professional expertise or skill." *Cannon v. McKen,* 296 Md. 27, 36, 459 A.2d 196, 201 (1983); *see also* § 3-2A-01(g). The Fourth Circuit has held that the HCMCA "must be enforced by [federal] courts" and requires medical malpractice plaintiffs to exhaust the HCMCA's arbitration remedy before bringing suit in federal court. *See Rowland v. Patterson*, 882 F.2d 97, 97, 99 (4th Cir. 1989); *see also Zander v. United States*, 843 F. Supp. 2d 598, 604-05 (D. Md. 2012) *aff'd,* 494 F. App'x 386 (4th Cir. 2012) (dismissing medical malpractice claim because plaintiff failed to comply with HCMCA preconditions).

In Count Eight, Hanlin-Cooney asserts that Conmed and CMHS are liable for the acts of their employees "who were responsible for the care of persons, including Mr. Hanlin, held in the Detention Center who needed or claimed a need for medical treatment." ECF No. 1 ¶ 193. The complaint otherwise contends that Hanlin was not provided with sufficient medical treatment, which resulted in his death. *See, e.g., id.* ¶¶ 3, 16. Accordingly, this claim arises from injuries from a "failure to render health care" and is within the scope of the HCMCA.[24] Because Hanlin-Cooney has not exhausted this claim under the

---

[24] *See Cannon*, 296 Md. at 36, 459 A.2d at 201 (citing, with approval, *Jackson v. Biscayne Medical Center, Inc.,* 347 So.2d 721 (Fla. 3rd DCA 1977), which "concluded that claims asserted in terms of negligence and negligent training of hospital personnel were claims of medical malpractice [but], allegations of false arrest, malicious prosecution, [etc] did not deal with malpractice"); *Afamefune ex rel. Afamefune v. Suburban Hosp., Inc.*, 385 Md. 677, 688, 870 A.2d 592, 598 (2005) ("Where a plaintiff alleges that he or she was injured by a health care provider during the rendering of medical treatment or services, the Act is implicated, regardless of whether the claim sounds in negligence or intentional tort."); *cf. Blumenthal*, 295 Md. at 114, 453 A.2d at 1204 (HCMCA "encompasses a claim of malpractice by a health care provider, whether it forms the basis of a suit against that health care provider or a suit against a non-health care provider under the doctrine of *respondeat superior*"); *Long v. Rothbaum*, 68 Md. App. 569, 578, 514 A.2d 1223, 1227 (1986) (tort claims against hospital were under HCMCA because they "stem[med] from the rendering of health care in alleged contravention of standards applicable to that care [and] implicate[d] directly the professional competence of the [hospitals]").

HCMCA's procedures,[25] Count Eight will be dismissed as to Conmed and CMHS.

D. Section 1983 Claims

The claims that remain are the § 1983 claims (Counts One through Four), and the Article 24 claim against the medical defendants (Count Five).

Section 1983 provides a remedy against any person who, acting under color of law, deprives another of constitutional rights. 42 U.S.C. § 1983. It "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver,* 510 U.S. 266, 271, 114 S. Ct. 807, 127 L.Ed.2d 114 (1994) (internal quotation marks and citation omitted).

In § 1983 actions "arising out of jail suicides[,] prison officials violate the civil rights of inmates when they display 'deliberate indifference to serious medical needs.'" *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) (*citing Estelle v. Gamble,* 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L.Ed.2d 251 (1976)). Pretrial detainees are also entitled to medical treatment, "and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious

---

[25] Hanlin-Cooney states that, on July 9, 2013, she "filed parallel wrongful death and survival claims with Maryland's Health Care Alternative Dispute Resolution Office." ECF No. 19 at 8.

24

medical needs." *Id.* (*citing Loe v. Armistead,* 582 F.2d 1291,
1294 (4th Cir. 1978)); *Young v. City of Mount Ranier*, 238 F.3d
567, 575 (4th Cir. 2001) (pretrial detainees' Fourteenth
Amendment claims of inadequate medical care governed by same
standard--deliberate indifference to serious medical needs--as
Eighth Amendment claims of convicted prisoners).

Deliberate indifference to a serious medical need requires
objective proof that the plaintiff was suffering from a serious
medical need and that the prison staff were subjectively aware
of the need for medical attention but failed to provide it. *See*
*Farmer v. Brennan,* 511 U.S. 825, 837, 114 S. Ct. 1970, 128
L.Ed.2d 811 (1994). Objectively, the medical condition must be
serious. *See Hudson v. McMillian,* 503 U.S. 1, 9, 112 S. Ct.
995, 117 L.Ed.2d 156 (1992) (there is no expectation that
prisoners will be provided with unqualified access to health
care). A substantial risk of suicide is a serious medical
condition. *Brown v. Harris,* 240 F.3d 383, 389 (4th Cir. 2000).
Proof of an objectively serious medical condition does not end
the inquiry.

The subjective component requires "subjective recklessness"
in the face of the serious medical condition. *See Farmer,* 511
U.S. at 839-40. "True subjective recklessness requires
knowledge both of the general risk, and also that the conduct is
inappropriate in light of that risk." *Rich v. Bruce,* 129 F.3d

336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference," *Brice v. Virginia Beach Correctional Center,* 58 F.3d 101, 105 (4th Cir. 1995), because, to be liable, a person must "consciously disregard a substantial risk of serious harm," *Farmer*, 511 U.S. at 839 (internal quotation marks and punctuation omitted). With the requisite subjective knowledge, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer,* 511 U.S. at 844. The reasonableness of the actions taken is judged in light of the defendant's actual knowledge of the risk. *Brown,* 240 F.3d at 390 (*citing Liebe v. Norton,* 157 F.3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

1. Individual Liability

The doctrine of *respondeat superior* does not apply in § 1983 actions. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978). To state a claim of individual liability under § 1983, Hanlin-Cooney must allege that each defendant was personally involved in the alleged deprivations or that: (i) he had actual or constructive knowledge that his staff was engaged in unconstitutional conduct; (ii) he tacitly authorized the

conduct; and (iii) there was an affirmative causal link between the supervisor's inaction and the injury suffered by the Plaintiff. *See Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994); *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir. 1984).

### a. Personal Involvement

#### i. Moore

The medical defendants contend that Hanlin-Cooney failed "to plead facts to demonstrate that Nurse Moore had subjective knowledge that Mr. Hanlin was a suicide risk." ECF No. 7-1 at 6. Hanlin-Cooney argues that a "fair reading" of the complaint "is that knowing Mr. Hanlin was at risk of suicide while withdrawing from narcotics, [Moore] did nothing." ECF No. 19 at 6.

The complaint alleges that Moore observed that Hanlin appeared to be under the influence of a narcotic and was slurring his words. ECF No. 1 ¶¶ 75, 77. She also knew that he had a history of substance abuse. *Id.* ¶ 75. The complaint does not allege that Moore knew Hanlin was a suicide risk or was experiencing symptoms of withdrawal when she evaluated him.[26] *See id.* Also, the complaint states that no one at the Detention

---

[26] At most, the complaint suggests that Moore may have been negligent in failing to diagnose Hanlin as suicidal, but negligence in diagnosis is insufficient to state a claim of deliberate indifference. *See Sosebee v. Murphy,* 797 F.2d 179, 181 (4th Cir. 1986) (*citing Estelle,* 429 U.S. 97, 97 S. Ct. 285).

Center obtained "any information about Mr. Hanlin's recent drug abuse and suicide threats from any independent health care provider or from any family member," and Moore's evaluation was performed before Hanlin-Cooney called the Detention Center to warn staff that Hanlin was a suicide risk. *Id.* ¶¶ 75, 79, 89-90. Accordingly, because Hanlin-Cooney failed to allege that Moore had knowledge that Hanlin was suicidal, the § 1983 claims against Moore will be dismissed.[27] *See Farmer*, 511 U.S. at 837; *Bridges v. Keller*, 519 F. App'x 786, 787 (4th Cir. 2013) (plaintiff failed to state a claim of deliberate indifference, because allegations established that "the defendants did not have actual knowledge of the precise nature of [plaintiff's] injury").[28]

---

[27] The complaint states that Moore, along with several other defendants "acted with deliberate and conscience-shocking indifference, as well as reckless disregard to Mr. Hanlin's serious medical needs." ECF No. 1 ¶ 117. However, "[t]he presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support a finding of deliberate indifference." *Young*, 238 F.3d at 577 ("The original complaint does not allege the existence of a substantial risk of serious harm to Young known to and disregarded by [defendant] or the existence of any serious medical needs known to and disregarded by [defendant].")

[28] *Cf. Belcher v. Oliver*, 898 F.2d 32, 35 (4th Cir. 1990) ("The officers had no absolute duty to protect Belcher from harming himself merely because he was intoxicated, where they had no reason to believe that his intoxicated state would lead to harm which was self-inflicted."); *Gordon*, 971 F.2d at 1094 ("[P]rison officials need not screen a pretrial detainee for suicidal

### ii. Kissane

The complaint alleges that Kissane recognized that Hanlin was a suicide risk and was going through withdrawal, and, in response, placed him on 0523 checks and ordered him housed in the Medical Unit. *See* ECF No. 1 ¶¶ 82-83. He was not provided any other medical treatment or surveillance. *See id.* ¶ 5. The complaint alleges that these steps were insufficient to address Hanlin's condition, because Kissane knowingly did not prescribe him appropriate medication to treat his withdrawal symptoms,[29] which contributed to his suicide, and because Kissane knew that placement in unmonitored Medical Unit cells was inappropriate for inmates at risk for suicide. *See id.* ¶¶ 41, 85, 141. "Because consciously withholding medical care can give rise to a plausible claim of deliberate indifference," *Newbrough v. Piedmont Reg'l Jail Auth.*, 822 F. Supp. 2d 558, 578 (E.D. Va. 2011), Hanlin-Cooney has stated a § 1983 claim against Kissane.

### iii. Swailes and DeGrange

The prison defendants contend that the claims against Swailes and DeGrange should be dismissed, because "neither

---

tendencies if they have no knowledge that the prisoner is suicidal.").

[29] The complaint alleges that the defendants--including Kissane-- knew that prescription drugs "were medically necessary [to alleviate] the pain and suffering that addicts experienced during drug dependency withdrawal" and that withdrawal increases the risk of suicide. ECF No. 1 ¶¶ 5, 54, 66, 82.

DeGrange or Swailes were ever warned of Mr. Hanlin's status as an 'active substance abuser who had recently threatened to take his own life.'" ECF No. 12-1 at 13. However, Hanlin-Cooney alleges that Swailes and DeGrange were responsible for performing "0523 checks" on inmates on the day that Hanlin committed suicide, that Hanlin was placed on 0523 checks, and that such checks are done on inmates at risk for self-harm. *Id.* ¶¶ 83, 86, 90. Thus, Hanlin-Cooney has sufficiently alleged facts from which the Court can infer that Swailes and DeGrange had actual knowledge of Hanlin's serious medical need.

Hanlin-Cooney also alleges that Swailes and DeGrange failed to perform several 0523 checks on Hanlin on the morning of his suicide. *Id.* ¶¶ 91-93. She also alleges that another inmate told "the correctional officers assigned to monitor" Hanlin that Hanlin had been crying out for help and threatening to commit suicide, but this information was "ignored." *Id.* ¶ 96. This is sufficient to state a claim of deliberate indifference, because it indicates that Swailes and DeGrange were aware of the risk that Hanlin might commit suicide but did not act in response to that risk.[30] *See Bridges*, 519 F. App'x at

[30] The prison defendants assert that, because "Swailes and DeGrange had no objective reason to suspect that Mr. Hanlin was a suicide risk, [their] alleged failure to follow procedures established for the general protection and welfare of detainees at the [Detention Center] does not constitute deliberate disregard for the medical needs of a particular intoxicated

787 ("[O]fficials evince deliberate indifference to a serious medical need by completely failing to consider an inmate's complaints . . . ."). The defendants' motion to dismiss the § 1983 claims against Swailes and DeGrange will be denied.[31]

### iv. DeLauter, Jenkins, Conmed, and CMHS

Hanlin-Cooney also alleges that DeLauter, Jenkins, Conmed, and CMHS acted with deliberate indifference to Hanlin's serious medical needs. *See, e.g.*, ECF No. 1 ¶ 134. However, the complaint does not allege any facts from which the Court can

---

individual." ECF No. 12-1 at 14. However, the complaint alleges that 0523 checks are done on inmates who pose a risk of self-harm, and that Hanlin was threatening to kill himself on the morning of his suicide. ECF No. 1 ¶¶ 83, 86, 96. Accordingly, Swailes and DeGrange had an "objective reason" to suspect Hanlin was suicidal, making their failure to perform checks more likely to be unreasonable.

[31] Almost two months after their court-extended deadline to file their motion to dismiss, the prison defendants filed a "supplement" to their motion that makes additional arguments why the complaint should be dismissed. ECF Nos. 6, 22. Hanlin-Cooney argues that the Court "should simply strike the supplemental filing because it . . . was grossly untimely," and the prison defendants did not seek the Court's "permission . . . to file untimely." ECF No. 24 at 1. Federal Rule of Civil Procedure 6(b)(1) provides that "[w]hen an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." *See also* Local Rule 105.2(a) (D. Md. 2011) ("All motions must be filed within deadlines set by the Court."). The prison defendants did not move to supplement their motion to dismiss after the deadline set by the Court, they have not argued or shown that their late filing was the result of excusable neglect, and they filed a separate reply brief. *See generally* ECF Nos. 22, 25. Accordingly, the Court will not consider the arguments raised in the prison defendants' untimely supplement.

infer that Conmed, CMHS, DeLauter, or Jenkins knew of Hanlin's serious medical needs. *See Newbrough*, 822 F. Supp. 2d at 581 ("To assert a plausible claim of deliberate indifference, it is essential to show actual knowledge or awareness on the part of the alleged inflicter.") (*citing Brice*, 58 F.3d at 105 (internal quotations omitted)). Without awareness of Hanlin's needs, there is no "conscious disregard" of those needs sufficient to establish a deliberate indifference claim. *See id*.

### b. Supervisory Liability

The prison defendants contend that the § 1983 claims against Jenkins and DeLauter should be dismissed, "because they were not present when Mr. Hanlin was arrested or when he committed suicide." ECF No. 12-1 at 11. The medical defendants contend that the § 1983 claims against Conmed and CMHS should be dismissed, because there is no *respondeat superior* liability in § 1983 actions, and thus no supervisory liability. *See* ECF No. 7-1 at 3. Hanlin-Cooney contends that "[s]upervisory liability exists under [§] 1983 and it holds supervisors liable . . . when they have actual knowledge of unconstitutional conduct by subordinates and show deliberate indifference to stopping it." ECF No. 23 at 14; *see also* ECF No. 19 at 6 ("Conmed and CMHS allowed policies and practices that they knew were deficient to persist . . . .").

Although Jenkins, DeLauter, CMHS, and Conmed cannot be liable under *respondeat superior* principles for Hanlin's death, *see Monell*, 436 U.S. at 691, they may be liable as supervisors if their "continued inaction in the face of widespread abuses . . . provides an independent basis for finding [they were] deliberately indifferent or acquiesced in the constitutionally offensive conduct of [their] subordinates," *Newbrough*, 822 F. Supp. 2d at 585 (*quoting Slakan*, 737 F.2d at 373).

### i. Jenkins and DeLauter

Here, Hanlin-Cooney has alleged that Jenkins and DeLauter-- who were allegedly responsible for setting and enforcing Detention Center policy--ordered staff not to prescribe appropriate medication to persons suffering from drug withdrawal, which allegedly contributed to Hanlin's suicide. ECF No. 1 ¶¶ 5, 24-25, 54-55, 85. They also knew that placement in Medical Unit cells posed a risk to suicidal inmates, as another inmate had committed suicide the previous year under similar conditions as Hanlin, yet did not act to remedy the problem. *See id.* ¶¶ 108, 141. Further, the complaint alleges that Jenkins and DeLauter knew that correctional officers did not have sufficient time to perform assigned tasks, including 0523 checks, but did not act to remedy the staffing shortages causing the problem, which also allegedly contributed to Hanlin's suicide. *See id.* ¶¶ 39, 94. Accordingly, Hanlin-

Cooney has stated a § 1983 claim of supervisory liability against Jenkins and DeLauter under Counts One, Two, and Three.[32] *See, e.g.*, *Slakan*, 737 F.2d at 373 (plaintiff established supervisory liability, because defendant "was responsible for the day-to-day operations of the Central Prison and for the training and conduct of the guards" and "knew of and condoned" unconstitutional conduct by his staff); *Newbrough*, 822 F. Supp. 2d at 585 (plaintiff stated a claim of deliberate indifference by alleging that "a pattern of deficient detainee medical care persisted under Superintendent Toney's administration" which suggested "deliberate inaction").

## ii. Conmed and CMHS

The complaint does not allege that Conmed and CMHS were aware of any of the policies or practices that allegedly contributed to Hanlin's death. In the complaint, the only factual allegations about Conmed and CMHS as entities--other than those describing Conmed's and CMHS's corporate structure-- are that the Detention Center contracted with Conmed to provide

---

[32] In their reply brief, the prison defendants contend that they are entitled to qualified immunity. *See* ECF No. 25 at 13. However, this argument was not raised in the motion to dismiss or Hanlin-Cooney's opposition. Accordingly, the Court will not consider this argument until it is properly raised and Hanlin-Cooney is given an opportunity to respond. *Clawson v. FedEx Ground Package System, Inc.*, 451 F. Supp. 2d 731, 734-35 (D. Md. 2006) (*citing U.S. v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006) (arguments raised for the first time in a reply memorandum are ordinarily not considered)).

healthcare services and that Conmed had a financial incentive to provide less care to inmates. *Id.* ¶¶ 28-29, 56. Otherwise, the complaint only states, in a conclusionary fashion, that Conmed and CMHS, along with several other defendants, are liable "for their actions, supervision, or supervisory directives, causing, and/or knowingly acquiescing in personnel's decisions" that deprived Hanlin of his "constitutional rights." *Id.* ¶ 128. The only "supervisory directives" described in the complaint are those of DeLauter and Jenkins. *See, e.g.*, *id.* at ¶¶ 54-55. These allegations raise only the "mere possibility of misconduct" and are insufficient to state a claim. *See Iqbal*, 556 U.S. at 679. The § 1983 claims will be dismissed as to Conmed and CMHS.

### c. Municipal Liability

As a local government entity, the County is subject to suit under § 1983. *See, e.g.*, *Ihnken v. Gardner*, 927 F. Supp. 2d 227, 235 (D. Md. 2013) (*citing Love-Lane v. Martin,* 355 F.3d 766, 782 (4th Cir. 2004)). However, municipalities are not liable for the constitutional violations of their employees merely because they are employees. *Monell,* 436 U.S. at 691; *Spell v. McDaniel,* 824 F.2d 1380, 1385 (4th Cir. 1987). Liability may attach, however, when municipal policy or custom inflicts the violations. *Monell,* 436 U.S. at 694; *Spell,* 824 F.2d at 1385-86. The policy or custom must be "fairly

35

attributable" to the municipality and the "moving force" behind the violation. *Spell,* 824 F.2d at 1387. "Municipal policies include formal and informal decisions made by municipal officials authorized to make final decisions." *Castle v. Wolford,* 165 F.3d 17, at *2 (4th Cir. 1998) (table); *Spell,* 824 F.2d at 1387. A policy or custom can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests a deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle,* 326 F.3d 463, 471 (4th Cir. 2003) (internal quotation marks omitted).

The prison defendants and the County contend that Count Four should be dismissed, because the County cannot be liable for the decisions and policies made by Jenkins, who is a State official. *See* ECF No. 12-1 at 17-18. They also argue that, as a State official, Jenkins has Eleventh Amendment immunity from suit in his official capacity. *Id.* at 15-16. However, as an alternative to dismissal, the defendants request bifurcation of the Count Four "pattern and practice" claims, because such claims depend on a showing that a violation of Hanlin's rights occurred. *See* ECF No. 12-1 at 25-26. Hanlin-Cooney contends that "Frederick County may be held liable under [§ 1983] . . .

if Sheriff Jenkins's actions or inactions represented official County policy in an area for which the County was legally responsible." ECF No. 23 at 19. She opposes bifurcation on grounds of the delay and expense it will cause. *See id.* at 30-31.

### i. Final Policymaking Authority

In *Dotson v. Chester*, 937 F.2d 920, 921-22 (4th Cir. 1991), the Fourth Circuit affirmed the district court finding that Dorchester County, Maryland was responsible for the attorneys' fees and costs allocated to the Dorchester County Sheriff in a settlement of § 1983 claims "alleging unconstitutional conditions in the County Jail." The Court noted that "liability relies more on final policymaking authority than on the technical characterization of an official as a state or county employee" and that "the identification of policymaking officials is a question of state law." *Id.* at 924. The Court then engaged in an exhaustive analysis of Maryland law to conclude that the Dorchester County Sheriff, in managing the County jail, acts as a county official. *Id.* (*quoting City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S. Ct. 915, 924, 99 L. Ed. 2d 107 (1988)).

Here, Hanlin-Cooney has alleged that Jenkins is the "executive responsible for" the Detention Center's "official policy, practices, customs and regulations." ECF No. 1 ¶ 24.

37

She has also alleged the existence of several Detention Center customs or policies that violated Hanlin's rights to adequate medical care for his serious medical condition. *See, e.g.*, *id.* ¶¶ 5, 24. However, the Court need not decide now whether "notwithstanding Sheriff Jenkins's status as a state employee, his actions or inactions could represent Frederick County's policies or customs for which Frederick County will be legally responsible," because the Court will bifurcate and stay Count Four until whether Hanlin's constitutional rights were violated is resolved. *See Fether v. Frederick Cnty., Md.*, CIV. CCB 12-1674, 2013 WL 1314190, at *7 (D. Md. Mar. 29, 2013) (bifurcating case and postponing resolution of question of Frederick County's and Sheriff Jenkins's liability for Jenkins's Detention Center policies); *Durham v. Somerset Cnty., Md.*, CIV.A. WMN-12-2757, 2013 WL 1755372, at *3 (D. Md. Apr. 23, 2013) *reconsideration denied,* CIV. JKB-12-2757, 2013 WL 5962958, (D. Md. Nov. 6, 2013) (postponing determination whether sheriff was a state or county policymaker with respect to a specific policy until after discovery was completed).

ii. Bifurcation

Under Federal Rule of Civil Procedure 42(b),

> [f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a

> separate trial, the court must preserve any federal
> right to a jury trial.

The decision to order separate trials is within the Court's "sound discretion." *Bowie v. Sorrell,* 209 F.2d 49, 51 (4th Cir. 1953). Although "complex" issues may justify bifurcation,[33] separating issues for trial "is not to be routinely ordered."[34] Whether bifurcation is appropriate is fact specific. *Dawson v. Prince George's Cnty.*, 896 F. Supp. 537, 539 (D. Md. 1995). However, "[b]ifurcation is fairly common in Section 1983 cases where a plaintiff has asserted claims against individual government employees as well as the municipal entity that employs and supervises these individuals." *Beasley v. Kelly,* No. DKC 10-0049, 2010 WL 3221848, at *3 (D. Md. Aug. 13, 2010).[35] Absent a finding that Hanlin's rights were violated, the County and Sheriff Jenkins, in his official capacity, cannot be liable. *See Robertson v. Prince George's Cnty., Md.*, 215 F. Supp. 2d 664, 665 (D. Md. 2002); *Marryshow v. Town of Bladensburg*, 139

---

[33] *Shetterly v. Raymark Indus., Inc.,* 117 F.3d 776, 782 (4th Cir.1997) (bifurcating asbestos case because numerous causation issues had to be resolved before legal theories and damages could be addressed).

[34] Fed. R. Civ. P. 42(b) advisory committee's note.

[35] *See also, e.g., Housley v. Holquist,* 879 F. Supp. 2d 472, 476 (D. Md. 2011); *Cann v. Balt. Cnty.,* No. WMN-10-2213, 2011 WL 588343 (D. Md. Feb. 9, 2011); *Jones v. Ziegler,* 894 F. Supp. 880, 883 (D. Md. 1996), *aff'd sub nom. Jones v. Wellham,* 104 F.3d 620 (4th Cir. 1997).

F.R.D. 318, 319 (D. Md. 1991). Similarly, Jenkins and DeLauter

have no supervisory liability if their subordinates did not

violate Hanlin's constitutional rights. *See, e.g.*, *Jackson v.*

*Wiley*, 352 F. Supp. 2d 666, 683 (E.D. Va. 2004) *aff'd,* 103 F.

App'x 505 (4th Cir. 2004). The complaint alleges several County

policies that violated Hanlin's rights, *see, e.g.*, *supra* note

11, which will likely require extensive discovery. Thus,

bifurcating Count Four, and the supervisory liability claims

against Jenkins and DeLauter in Counts One through Three, from

the remaining claims will serve judicial economy and

convenience. *See Gray v. Torres,* Case No. WDQ-08-1380, 2009 WL

2169044, at *5 (D. Md. July 17, 2009). These claims, and

discovery on them, will be stayed pending resolution of the

remaining claims.

E. Article 24

The only remaining Article 24 claims are against the

medical defendants. Article 24[36] claims are construed in *pari*

*materia* with the Fourteenth Amendment. *See Dent v. Montgomery*

*Cnty. Police Dep't*, 745 F. Supp. 2d 648, 661 (D. Md. 2010)

*(citing Canaj, Inc. v. Baker & Div. Phase III, LLC*, 391 Md. 374,

---

[36] Article 24 states "[t]hat no man ought to be taken or
imprisoned or disseized of his freehold, liberties or
privileges, or outlawed, or exiled, or, in any manner,
destroyed, or deprived of his life, liberty or property, but by
the judgment of his peers, or by the Law of the land." Md.
Const. Declaration of Rights, art. 24.

424, 893 A.2d 1067, 1097 (2006)). However, unlike § 1983, "local government entities have *respondeat superior* liability for violations of the Maryland Declaration of Rights that were committed by the entity's agents and employees acting within the scope of their employment." *Kashaka v. Baltimore Cnty., Maryland*, 450 F. Supp. 2d 610, 618 (D. Md. 2006) (*citing DiPino v. Davis*, 354 Md. 18, 53, 729 A.2d 354, 373 (1999)). Accordingly, Count Five will be dismissed as to Moore only, as Hanlin-Cooney has stated a claim against Kissane, who is alleged to have acted within the scope of her employment with Conmed and/or CMHS. *See supra* Section II.D.1.a; ECF No. 1 ¶ 30.

III. Conclusion

For the reasons stated above, the defendants' motions will be granted in part and denied in part.

_2/10/14_
Date

William D. Quarles, Jr.
United States District Judge